GREAT CAMP KNIGHTS OF THE MODERN MACCABEES v. DEEM.

MODERN WOODMEN OF AMERICA v. SAME.

1. LIFE-INSURANCE—RIGHT TO PROCEEDS—BILL OF INTERPLEADER —EVIDENCE—CHANGE OF BENEFICIARY.

On a bill of interpleader to determine the right to the proceeds of certain life-insurance policies, testimony as to assured's statements as to his purpose in substituting his sister in place of his wife as beneficiary is admissible upon the issue of his mental competency, but not for the purpose of proving a gift.

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence examined, and *held*, to show that assured's purpose was not to make a gift to his sister, but to secure her for money to be advanced for his support and certain loans theretofore made to him by their mother.

Appeal from Kent; Wolcott, J. Submitted January 11, 1906. (Docket Nos. 57, 58.) Decided April 30, 1906.

Bills of interpleader by the Great Camp Knights of the Modern Maccabees and the Modern Woodmen of America against Ella E. Deem and Alice J. Phillips to determine the right to the proceeds of certain policies of insurance. From a decree for defendant Deem, defendant Phillips appeals. Reversed.

*Claude R. Buchanan* (*Francis A. Stace*, of counsel), for appellant.

*Knappen, Kleinhans & Knappen* and *Ernest L. Bullen*, for appellee.

BLAIR, J. Charles H. Phillips became insured in the Maccabees in October, 1898, in the sum of $2,000. His wife, Alice J. Phillips, was named as the beneficiary.

On the 16th day of October, 1902, he revoked the designation of his wife as beneficiary and designated his sister, Ella E. Deem, in her stead, and a new certificate was thereupon issued in favor of Mrs. Deem.   He also became insured in the Modern Woodmen of America for the sum of $2,000, in favor of his wife, in April, 1895.   This certificate was lost and a new one issued in favor of his wife, June 2, 1902.   On October 16, 1902, he designated his sister, Mrs. Deem, as beneficiary under this policy instead of his wife.

After his death, his widow, Alice J. Phillips, presented a petition to both the Maccabees and the Woodmen, stating that for more than two years previous to his death he had been afflicted with a disease which had the effect of weakening and rendering his mind unsound as well as his body, and that for nine months previous to his death his mind had become greatly enfeebled and unsound, gradually growing worse; that he had become subject to aberrations, and, among other delusions, he had become strongly impressed with the erroneous idea and delusion that he was in danger of suffering for want of the necessaries of life and from poverty; that during the said nine months, his mother and his sisters, Mrs. Deem, Mrs. Johnson, Mrs. Aldrich, and his brother Lewis, who, Mrs. Phillips claims, had been unfriendly to her, had fostered these erroneous ideas and delusions, and she charged that Mrs. Deem, in particular, had fraudulently contrived to procure herself to be substituted as the beneficiary in said certificates, and that substitution was attempted to be made for the purpose of securing the payment of an alleged pre-existing indebtedness of the said Charles H. Phillips, as well as to secure payment of moneys proposed to be lent to him thereafter.   The disease which is supposed to have thus affected him was Bright's disease.

The Maccabees and Woodmen each filed bills of interpleader against Mrs. Phillips and Mrs. Deem, and paid the amount of insurance into court, and decrees were made that their bills were well filed, and the defendants

were directed to interplead, which they did. The testimony in the case was taken in open court, and a large number of witnesses were examined, pro and con, and the court made a decree, without filing any opinion, sustaining the change of beneficiaries, and awarding the fund to Mrs. Deem. Mrs. Phillips appealed.

The great bulk of the testimony in this case was directed towards showing the mental condition of Charles H. Phillips and his relations towards his wife during the 20 years of their married life. It would be impossible within the limits of this opinion to discuss the testimony, and no useful purpose would be served thereby. Suffice it to say, that I have arrived at the conclusion that the mind of Mr. Phillips was impaired to some extent, but not to such an extent as to invalidate his acts in changing the beneficiaries in the insurance certificates in question here. Neither, in my opinion, would this court be justified in finding from this record that Mr. Phillips was actuated by any insane delusion concerning his wife. I am satisfied, however, that it was not the intention of Mr. Phillips to make an absolute gift of the certificates to his sister, Mrs. Deem, but that he transferred them to her as a security for pre-existing indebtedness and for moneys and support to be thereafter advanced and furnished. Appellees say in their brief concerning Mr. Phillips' financial condition at this time:

" He was then recovering from a serious and expensive illness. He was then out of a job. His doctor bills were unpaid. His finances were so low that he was taking money from his collection of old coins to repair his daughter's shoes. His home was mortgaged. His salary as alderman of $1 per day depended wholly upon his ability as a campaigner in his then condition to be re-elected in April. He knew that campaign expenses were heavy, and had to be met to secure an election. His tenement house was rented for $11 per month, out of which he must pay taxes on both properties. He must pay insurance, interest, water tax, and repairs. His lodge dues and life insurance must be paid, and his wife and child must be fed and clothed. He had been seriously incon-

venienced and vexed because his lodge had refused to pay his sick benefits, and had finally forced him to compromise by discounting his claim."

Mrs. Deem testified that in February, 1902:

"I said, 'Charley, I would not allow myself to worry about that; I should borrow some money on my home or on my insurance, and settle up the little bills, if there are any bothering you.' * * * I made this suggestion because he did not see how he was going to get along without working six months. Of course, for a while they could get along, but he said, 'I can't meet my bills six months lying idle.' I made the suggestion to quiet his mind, and show him how he could pull through. I could see it would be pretty hard to get along six months without working, and I was willing to help him, only I wanted security for it. That is all, so long as he had it. If he hadn't anything to give me, I should have helped him, and so told him. I never knew that these policies could not be used as collateral until here in court. I have often heard of people loaning money on their insurance, and did not know that it applied to any particular kind of insurance. That didn't mean to assign me the insurance, but to give me an interest in it to pay back the obligation, simply as security. At this time I gave him no money. * * *

"During his sickness in September we had about the same conversation about his insurance that we had before. The only thing that I remember differently was my saying, 'Either Lew or I would let you have the money, Charley, if you need it.' The conversation came up about his speaking about the grocery bill being due, and that he was just about out of money. Then I said, 'Charley, you remember what I said about letting you have money on your insurance. I arranged that, and I heard Lew say he would do it too, if you want it.' * * *

"Charley first spoke about transferring this insurance to me on the day he came to our house; I think it was on October 15th. He said he could not get a division of the property. 'All I can handle or control is my insurance, and,' he says, 'I am going to control it, and I have made up my mind to assign it to you.' He says, 'I don't want Allie to have it. She has got all I have earned for the last 50 years, all my lifetime, and now the insurance I don't propose she shall have.' On Friday morning he

first mentioned about paying mother out of his insurance, what he owed her. He said, 'I have something to say when mother is in the room,' and when she came in, he said to me, 'I want you to see that mother gets her pay out of that insurance, the unsecured notes that she holds against me.' And I said to him, 'Charley, at any time, if you ever need anything that you cannot supply yourself, call on me for it.' He replied, 'Well, you have always provided for me when I have needed it, in that way, but now we will have the insurance. I should not feel so much like a pensioner upon your charity, if I knew I could not pay it back, and if there is anything left, you have it.' He said, 'Maybe I will use it all, but maybe I will not use any of it.'  *  *  *

" I remember of that morning's conversation when he first came in. He didn't say who he was going to assign the policies to; but I think before dinner he said he was going to transfer them to me. I was surprised, because he had formerly transferred them to mother. I never asked him to assign them to me. Never thought of such a thing. Never thought of his assigning them to any one until he came there, and left his home, then I naturally supposed he would assign them to mother, and I did not know why he should assign them to me instead of to mother.  *  *  *

" He said to mother, in my presence, that he did not think it necessary to tell the insurance agents his domestic troubles, and he had told them he wanted to make a loan, and that was a sufficient excuse, and did not go into details; did not think it was necessary. Up to this time there had been no talk between him and me about being made to secure a loan. I have told you all about the loan, the two times I spoke to him about loaning him money if he needed it, and he could secure me on his insurance. That is the only time that his insurance in connection with my name was ever mentioned in the world.  *  *  *

" On Friday morning he told me he wished to say something to me when ma was present, and when mother came in he said, 'Now you are both here, I want to say to you, Ella, that if I don't live to be a burden on you, or use up all the money you might get from this insurance, I want you to see that my mother is paid the unsecured notes that she holds against me.' I said, 'Charley, you ought to know that if I had any money coming from you, and you owe mother, that I should pay it.' He said, 'Well, I simply want you to speak about it, so you will

know what I want.' I knew of the notes, knew when he borrowed the money. The notes were given for borrowed money to be used in his business. * * *

"*Q.* Did you take any steps to adjust this matter with Mrs. Phillips, after his burial ?

"*Mr. Stace:* That is objected to as privileged.

"*A.* I did.

"*Q.* When ?

"*Mr. Stace:* I object to all that tends to show an attempted adjustment, as being incompetent and privileged.

"*Mr. Kleinhans:* Well, that is probably true ordinarily. If your honor please, I state that my object in showing what she did, I think is competent in this case, as bearing upon the question of undue influence.

"*Mr. Stace:* It is not competent in any case.

"*A.* On the day after the funeral, October 29th, I went to Mr. Kleinhans' office and met Mr. Bullen there, and I told them that I heard Mrs. Phillips was going to make trouble, and I did not want it, and I had this insurance assigned to me without any solicitation whatever on my part. I had nothing whatever to do with it. It was simply, as it were, thrust upon me, and that under the circumstances, rather than have a lawsuit, rather than to drag my poor old mother into court, and the fact of my never soliciting it, and together with all the other circumstances, I would rather give Mrs. Phillips $2,000, which I knew would pay all indebtedness, and leave her a thousand dollars besides. I would rather also put $1,200 in trust for Blanche, the court to appoint a trustee, for Blanche's care and education, especially her education, and the remaining $800 I wanted to use to pay my mother the notes my brother requested I should pay, and reimburse myself what I had been out for his last sickness, and the little money I gave him; which was a trifle. I gave Mr. Bullen and Mr. Kleinhans instructions to communicate that proposition to the counsel of Mrs. Phillips, and I waited in Mr. Kleinhans' office while they went over to Mr. Chandler. When they came back they reported, the way I understood it, that Mr. Chandler thought it was a fair proposition. I understood it had been communicated to him. I never received any reply to that proposition. I left it standing there until the day I left for California, which was December 3d. Then I told my brother-in-law to telephone Mr. Kleinhans that that offer was off.

" *Q.* If this money is decreed to you, Mrs. Deem, what is your intention to do with it ?

" *Mr. Stace:* Objected to as incompetent.

"*A.* I intend to do just as I said in my proposition at that time. I intend to 'reimburse myself and pay the debts, these notes and a few other things my brother told me he owed, although he did not require I should pay it, pay the costs of this litigation, and what is remaining I intend to spend for Blanche's benefit, if I am allowed to do it. I never had any intention or thought of profiting by it personally. I have always been willing, in my first proposition, I have shown that. Blanche has a marked talent for both music and elocution, and she should be educated in one or the other of them, and my intention is to do that."

Mrs. Phillips, the mother of Charles H., testified:

" I was present when Charles talked about this transfer of the policy to Mrs. Deem, and I think I can give what he said. He said he was going to transfer the insurance to you, Ella—Mrs. Deem. There was no more said. I recall distinctly what he said when he called both of us in. He says, 'I want you, Ella, to promise to see that mother is paid what I owe her, and the rest, do as you please with it.'"

Mr. Aldrich, a brother-in-law of Phillips, testified:

" Charley told me the reasons that he gave to the agents of the insurance companies for changing the policies. It was on the same Thursday he changed them. It was when we were driving. He said he told them it was for the purpose of making a loan. He stated that he did not care to go into details with them. I suppose he said so, as he did not want to tell them of the family troubles.

" *Mr. Stace :* I move to strike out what he supposes.

" *A.* Well, I know that that was the case, then.

" *Q.* Did he say so, or is that your inference ?

" *A.* Why, he said he did not want to go into family affairs."

Dr. Bigham testified:

" Yes, Charley used to call at my office. I think he was at my office between the time when he got out on his September sickness, which was early in October, to the time when he was taken down on the 20th of October for

his last sickness. I had some talk with him. As to his calling at my office about a week before his last illness, I can't remember dates as regards that. He was there several times. I remember of his speaking at that time about his·sister, and about getting money for himself and his family. He told me that his sister said she would furnish money to care for him, but she would not furnish it for himself and family. I presume that it was Mrs. Deem that he meant. I think that the words he used were, that he had spoken to Mrs. Deem, and that she said to him, 'Charley, if you want money for your family, you will have to secure me, as I will never furnish money to support your family;' that she would do anything to take care of him, but not for his wife. I don't recollect anything about the assignment of the policies, whether at this time about which I am testifying or not, it had been made or not.".

Mr. Saunders, record keeper of the Maccabee Tent, testified:

"He called on me at my office on October 15th (I did my business in reference to the Tent there); it was between 2 or 3 p. m. I noticed a cloth around his neck. I always thought he looked sick. He did not appear any different then that I could see otherwise. He drew his certificate from his pocket, and said he wanted to transfer his insurance to his sister, Mrs. Deem. I told him he could transfer all or a part of it. He said he wanted to transfer all, to secure a loan. He asked how long before he could get the new one. I told him about a week, and he told me when it came to send it to Mrs. Deem."

Mr. Worley, clerk of the Woodmen Camp, testified:

"Mr. Phillips called on me October 16, 1902, in the forenoon, at the office of Kent Camp Modern Woodmen, 41 Lyon street. He came in and said, 'Hello, Worley.' I shook hands with him through the window in the grating between the outer vestibule and the inside. He said he had a matter he would like to speak to me about privately. I asked him to have a seat inside. He then asked me if he could transfer his policy as collateral to a loan. I told him he could not. I told him what our by-laws provided for beneficiaries. I think I read the by-law to him. He said, 'Very well, that would do me. I can borrow what money I want of my sister. I believe I will

transfer it to my sister.' Previous to saying this, after reading the by-law, he asked, 'Can't I assign it at all?' or something like that. I told him he could assign it to nobody only a blood relative, or somebody that was dependent on him. He said all right, he would assign it to his sister. He said, 'I can borrow what money I want from my sister.' He wanted to assign it as security for a loan. He took the policy out of his pocket, and I filled out the blank on the back of it, having asked him his sister's full name, handed it to him, and he signed it at my desk, paid me the fee of 50 cents, and went away."

It is said in the brief for appellees:

" To this extent, the transaction seems to have the appearance of security, but it went further than this. The arrangement was that if there was anything left, Mrs. Deem was to do as she pleased with it. As his mother states, and as stated by Mrs. Deem, ' If there is anything left, you have it; if there is any more, use it as you see fit.'"

While the testimony referred to was admissible upon the issue of mental competency, it was not admissible for the purpose of proving a gift. *Great Camp K. O. T. M.* v. *Savage*, 135 Mich. 459. The change of beneficiaries in the certificates was either intended as an absolute gift, without legal restraint upon the disposition of the proceeds as claimed by appellee, or it was intended to be as a security simply, as indicated by Phillips' statements made to the record keepers at the very time of making the change. I think the fair inference is, from all of the competent testimony, that Mr. Phillips, acting upon the advice which his sister had given him, and the offers which she had made on several occasions, and to which he referred in his talk with Dr. Bigham about the time of the transfer, intended to secure payment of his existing indebtedness and such indebtedness as should arise in the future, and that he adopted the method used as the only means which he understood was open to him for that purpose, and which he supposed amounted, in effect, to an assignment of the original certificates as security for such indebtedness. That this was Mrs. Deem's understanding of the

transaction, I think is shown by her offer of settlement, and her testimony that in case of decree in her favor, she still intended to carry out that offer. If Mrs. Deem understood that the principal object of her brother in changing beneficiaries was to prevent his wife getting a dollar of the insurance, it is difficult to understand her conduct in this respect.

A decree will be entered providing for the payment out of the fund, of any moneys loaned to or advanced for Mr. Charles H. Phillips by Mrs. Deem, including funeral expenses and expenses of his last sickness; of the notes to his mother; of the taxable costs of the parties in this litigation in both courts, including solicitor's fees to the appellant and appellee of $150 each. The remainder of the fund will be turned over to appellant.

MCALVAY, GRANT, MONTGOMERY, and OSTRANDER, JJ., concurred.